## UNITED STATES v. WHEELER ET AL.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF ARIZONA.

No. 68. Argued April 28, 1920.—Decided December 13, 1920.

1. In all the States, from the beginning down to the establishment of the Articles of Confederation, the citizens possessed the right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective States, to move at will from place to place therein, and to have free ingress thereto and egress therefrom. A consequent authority resided in the States to forbid and punish violations of this right. P. 293.

2. Uniformity of this right was secured by the Articles of Confederation, not by lodging power in Congress to deal with the subject, but by subjecting the continued state power to the limitation that it should not be used to discriminate, Art. IV providing that the free inhabitants of each State, with certain exceptions, should be entitled to all the privileges and immunities of free citizens in the several States, and that the people of each State should have free ingress and regress to and from any other State. P. 294.

3. The Constitution, by Art. IV, § 2, plainly intended to preserve and enforce this limitation imposed upon the several States by Art. IV of the Articles of Confederation, and in so doing necessarily assumed that the States possessed the authority to protect the right of free residence, ingress and regress as a part of their reserved power. Id.

4. The Constitution does not guarantee this right against wrongful interference by individuals, but only against discriminatory action by States. P. 297. Crandall v. Nevada, 6 Wall. 35, distinguished.

5. A conspiracy to deprive citizens of the United States of their right to remain in a particular State, by seizing them and deporting them to another State, is not an offense under § 19 of the Criminal Code.

254 Fed. Rep. 611, affirmed.

THE case is stated in the opinion.

*Mr. W. C. Herron*, with whom *Mr. Assistant Attorney General Stewart* was on the briefs, for the United States:

Our claim, and our entire claim, is that the right of free ingress and egress is secured, not by any express provision of the Constitution (except in so far as the Fourteenth Amendment enlarges the scope of the term "citizen of the United States"), but impliedly by the creation of citizenship of the United States, as contradistinguished from purely state citizenship, which the Constitution as certainly and immediately effected as it did the Union itself. It was "the people of the United States" who ordained and established the Constitution, and it was they who, upon its ordination and establishment, became citizens of the United States. *McCulloch* v. *Maryland*, 4 Wheat. 316, 403, 404.

Prior to the Constitution the rights of such persons (if any) would be governed by international or municipal law. They would not differ materially in this respect from the rights of persons who were expelled at the present day from one of the United States into Canada or Mexico. In so far as the political bodies themselves were concerned, the only action possible would be diplomatic correspondence, followed (it may be) by reprisals or even by war. In so far as the individuals injured were concerned, there might be, either under international or under municipal law, prosecutions in the State *ab quo*, or, perhaps in the State *ad quem*, if it could be said that the crime was consummated in the latter.

What would be the situation after the Constitution?

For, in so far as greater or additional rights appear at the later period, such greater or additional rights must necessarily be rights granted and hence secured by the Constitution.

As to the political bodies, the right to diplomatic correspondence, reprisals, and war was expressly taken away by the Constitution, Art. I, § 10, and there arose therefrom a new and different remedial right, viz., the right to sue in the federal courts either the political body or the individuals responsible for the damage. *South Carolina* v. *Georgia*, 93 U. S. 4, 9; *Missouri* v. *Illinois*, 180 U. S. 208, 241; *s. c.*, 200 U. S. 496, 518–520; *Kansas* v. *Colorado*, 185 U. S. 125, 146, 147; *s. c.*, 206 U. S. 46, 96, 97; *Pennsylvania* v. *Wheeling Bridge Co.*, 13 How. 518; *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230, 237.

The question is, Did the Constitution change the situation, as respects the individuals injured, in any respect? Did it give them greater or additional rights? Or did it leave them as to their rights in the same situation in which it found them? Whereas before they were merely citizens of one particular State, being aliens in a sense to all others, they now became in addition citizens of the United States. This was implied in the very formation of the Federal Union. A new allegiance was created with a new corresponding duty in the liege of protection to the subjects. They came within the "peace of the United States." *In re Neagle*, 135 U. S. 1, 69. Their prog ess therefore from one State to another (or into the Territc ies), their egress from one, their ingress into another, while it might find them in places where their state citizenship would not give them all the rights it did at their domiciles, would never find them in any place where the all-prevailing quality of citizenship of the United States would not accompany them, with all the rights, substantive and remedial, which the term denotes.

It is important to emphasize the fact (as we claim)

that federal citizenship, with all its main privileges and immunities, came from the very fact of the institution of the new government under the Constitution, and not from the Fourteenth Amendment. Of this there can be no possible doubt.

It was early assumed and held, that the Constitution impliedly created a citizenship of the United States, and it followed necessarily that it also impliedly secured the requisite privileges and immunities of such a status. 1 Stat. 103; *Talbot* v. *Jansen*, 3 Dall. 133, 136, 153, 154; *State* v. *Hunt*, 2 Hill, 1, 218–220; *Hepburn* v. *Ellzey*, 2 Cranch, 445; *New Orleans* v. *Winter*, 1 Wheat. 91; *American Insurance Co.* v. *Canter*, 1 Pet. 511, 542; *Gassies* v. *Ballon*, 6 Pet. 761; *Lynch* v. *Clarke*, 1 Sandf. Ch. Rep. 583, 640, 641, 642; *Prentiss* v. *Brennan*, 2 Blatchf. 162, 164, 165; *Minor* v. *Happersett*, 21 Wall. 162, 165–167.

The right of a citizen of one of the States to free ingress and regress to or from another State (a right somewhat similar to the one set up in the indictment in the case at bar), is secured in some sense by § 2 of Art. IV of the Constitution. *Corfield* v. *Coryell*, 4 Wash. C. C. 371; *Paul* v. *Virginia*, 8 Wall. 168, 180; *Ward* v. *Maryland*, 12 Wall. 418, 430; *Slaughter-House Cases*, 16 Wall. 36, 75. We, however, expressly disclaim any reliance upon this constitutional provision. It was held in the *Slaughter-House Cases, supra*, that the rights referred to in § 2 of Art. IV are the fundamental rights of citizenship, as such, and not the rights peculiarly conferred upon the citizens of the United States first created by the Constitution. The rights of ingress and regress are impliedly included in § 2 of Art. IV merely because included in the fundamental rights to life, liberty, and the pursuit of happiness. These rights a citizen of a State is entitled to as such. The outland citizen acquires this right under the Constitution solely because the domestic citizen has it, and only to the same extent. He is entitled only to be free from discrim-

ination by the State, without "reasonable ground for the diversity of treatment." *Travis* v. *Yale & Towne Mfg. Co.*, 252 U. S. 60. His only remedy, therefore, under § 2 of Art. IV for actions such as are complained of in the case at bar would be by prosecution in the state courts, if the laws of the State provided such a remedy. It is possible that Congress might provide a remedy, if the State discriminated against him, in regard to such outrages, on account of his outland citizenship; but Congress (so far as we are aware) has never done so. At any rate § 19, Crim. Code, does not do so. It is therefore not enough in the case at bar to show that the right set up in the indictment is a fundamental right common to all citizens of civilized States everywhere. It must be shown in addition that it is a right peculiar to the complex, federal citizenship which is at the basis of the "indissoluble Union of indestructible States" created by the Constitution of the United States.

In this term "citizen of the United States," are included two fundamental concepts, bound together and interacting, viz., the concept of "the United States" as a corporate entity, exercising full and paramount sovereignty within its constitutional powers over all the persons within its territorial limits, and the concept of the several States as a collective body, retaining all their sovereign powers and activities over the persons within their territorial limits except in so far as those powers have been granted to the collective aggregate. Langdell, 12 Harvard Law Rev. 365, 367–370; *Tennessee* v. *Davis*, 100 U. S. 257, 263; *Ex parte Siebold*, 100 U. S. 371, 394; *Hoke* v. *United States*, 227 U. S. · 308, 321, 322.

The existence of the States prevents a citizen of the United States from deriving, as such, a right under the Constitution to territorial mobility within the limits of any particular State. To that extent he is dependent upon the laws and agencies of the several States. The right, how-

ever, to move freely, *suo intuitu*, from one State into another is an entirely different matter and brings into the problem the concept of the Union. It is a right necessarily inherent in federal citizenship and secured, therefore, by the Constitution. Unless this be true, no Union was in fact established in 1789, because no less than this can be properly attributed to citizenship of the United States.

The injury done by the defendants in this case has a double aspect, one toward the individuals deported and the other toward the State into which they were deported. By their deportation the individuals became, or might become, a charge upon the State of New Mexico, a disturbance of its peace, or an offense to its own state policy. According to the decisions of this court, and especially *Kansas* v. *Colorado*, and *Missouri* v. *Illinois*, *supra*, the offended State was secured by the Constitution a right to sue the offending State in the federal courts, and to have applied there, not the law of the offending State, but a general or international law. Is not this a strong reason for believing that the Constitution also secured a right to the individuals, not as citizens of Arizona but as citizens of the United States, to have their cases determined in a federal court by federal law?

In every case in which this court has applied § 19, Crim. Code, the claim that the offense was only assault, murder, kidnapping, etc., could have been, and in some of them evidently was made. Yet this court upheld the federal jurisdiction because the real purpose of the conspiracy was, not to murder, assault, etc., but to prevent voting, to prevent informing of crime, to prevent egress from a State. *United States* v. *Waddell*, 112 U. S. 76, 80; *Buchanan* v. *United States*, 233 Fed. Rep. 257.

The Fourteenth Amendment has had no effect upon the question presented in this case, except incidentally in so far as it has, perhaps, enlarged and constitutionally fixed

the status of a citizen of the United States. That status was fully recognized before the Amendment. See the discussion, including the decision by Mr. Justice Johnson in *Ex parte Eckstein,* and an opinion by Attorney General Wirt, relative to acts of South Carolina affecting the ingress and egress of free negroes. (Reports Committees, 27th Cong., 3d sess., House Rep. 80, pp. 15, 27, 35; Mass. Legal Docs., 1845, Senate No. 31.) See also *Prigg* v. *Pennsylvania,* 16 Pet. 539; *Passenger Cases,* 7 How. 283, 465–467, 492; *Crandall* v. *Nevada,* 6 Wall. 35, 43–45. *Crandall* v. *Nevada* has been referred to by this court in later cases with full approval, and undoubtedly represents the settled law. It is on principle decisive of the case at bar. *Slaughter-House Cases,* 16 Wall. 36, 79, 80; *Twining* v. *New Jersey,* 211 U. S. 78, 97, 98; Cooley, Principles of Constitutional Law, pp. 245, 246.

The point that in *Crandall* v. *Nevada,* the action complained of was by the State itself, whereas in the case at bar it is by individuals, does not distinguish that case from this one. If the right be one secured by the Constitution, Congress may protect it against action by individuals, as well as against action by the State, if it deem the former mode appropriate to the end. This is decided in *Prigg* v. *Pennsylvania, supra.* The Fourteenth Amendment expressly banned state action, but it did not limit the general and original power of Congress to protect rights secured by the Constitution in such manner as it thought most effective. This is proved by the case of *Crandall* v. *Nevada* itself, which arose prior to the Fourteenth Amendment and can therefore derive no assistance from its provisions. The fact that only state action was before the court in that case proves nothing as to the question whether a right of a citizen is secured under the Constitution only against state action. Indeed, the fallacy of the argument is shown by all the decisions which have held § 19, Crim. Code, constitutional. Particular reference may be made

to the statement of this court in *United States* v. *Reese,* 92 U. S. 214, 217.

As for the authorities after the Fourteenth Amendment, [*Slaughter-House Cases,* 16 Wall. 36, where the court stated that a citizen of the United States has a right specially secured under the Amendment to reside in a State for the purpose of acquiring citizenship therein— a right clearly violated in the case at bar—Justice Bradley's dissenting opinion, 16 Wall. 112, 113; *United States* v. *Reese,* 92 U. S. 214; *James* v. *Bowman,* 190 U. S. 127; *United States* v. *Cruikshank,* 92 U. S. 542, 552, 553; *Strauder* v. *West Virginia,* 100 U. S. 303; *Ex parte Virginia,* 100 U. S. 339; *Ex parte Siebold,* 100 U. S. 371; *Ex parte Yarbrough,* 110 U. S. 651, 663–666; *Wiley* v. *Sinkler,* 179 U. S. 58; *Swafford* v. *Templeton,* 185 U. S. 487; *United States* v. *Mosley,* 238 U. S. 383, 386; *United States* v. *O'Toole,* 243 U. S. 476, 485–489; *United States* v. *Bathgate,* 246 U. S. 220; *United States* v. *Harris,* 106 U. S. 629; *Hodges* v. *United States,* 203 U. S. 1, 14; *United States* v. *Powell,* 212 U. S. 564; compare *United States* v. *Shipp,* 203 U. S. 563; *Logan* v. *United States,* 144 U. S. 263, 293–295; *United States* v. *Waddell,* 112 U. S. 76, 80; *In re Quarles,* 158 U. S. 532, 536; *Motes* v. *United States,* 178 U. S. 458, 462, 463; *Baldwin* v. *Franks,* 120 U. S. 678; *United States* v. *Patrick,* 54 Fed. Rep. 338, 347,] we submit that the decisions of this court on the subject of the rights secured by the Constitution to a citizen of the United States show not only that these rulings do not in any manner or to any extent limit or qualify the principles made the basis of the judgment in *Crandall* v. *Nevada, supra,* but that they reinforce that decision by the uniform and consistent opinion of this court that § 19, Crim. Code, constitutionally covers every right of a citizen of the United States, as such, whether it arise from some express provision of the Constitution, or whether it be implied in the very organization and healthy operations of the Na-

tional Government which substituted for a mere league of States and a single state citizenship a real, vital Union based upon a citizenship of the United States.

*Mr. Charles E. Hughes,* with whom *Mr. E. E. Ellinwood, Mr. John Mason Ross* and *Mr. Clifton Mathews* were on the brief, for defendants in error:

There are two classes of rights enjoyed by citizens of the United States, as such, (a) rights by which one is entitled to protection merely against action by or on behalf of States where that action is in conflict with the provisions of the Federal Constitution, and (b) rights by which one is entitled to protection against the action of individuals. Section 19, Crim. Code, is not concerned with the former, but exclusively with the latter.

This distinction between federal rights which protect the citizen simply against state action, and federal rights which protect the citizen against the action of individuals, abundantly established by decisions of this court (*United States* v. *Cruikshank,* 92 U. S. 542, 554, 555; *Virginia* v. *Rives,* 100 U. S. 313, 318; *United States* v. *Harris,* 106 U. S. 629, 639; *Civil Rights Cases,* 109 U. S. 3, 11–13; *James* v. *Bowman,* 190 U. S. 127; *Barney* v. *City of New York,* 193 U. S. 430; *Hodges* v. *United States,* 203 U. S. 1, 14–16) has been disregarded in this prosecution. See also *Karem* v. *United States,* 121 Fed. Rep. 250; *United States* v. *Moore,* 129 Fed. Rep. 630; *United States* v. *Powell,* 151 Fed. Rep. 648, affd. 212 U. S. 564.

It thus appears that it is not enough for the Government to establish that there is a federal right, in order to invoke § 19, if it appears, as we submit it does clearly appear in the present case, that the right is of that class which connotes protection only against state action.

The decisions may be searched in vain for any authoritative precedent applying § 19, unless there is a right to protection as against individual action and not simply as

against state action. *Ex parte Yarbrough,* 110 U. S. 651; *Guinn v. United States,* 238 U. S. 347; *United States v. Mosley,* 238 U. S. 383; *United States v. Butler,* Fed. Cas. No. 14,700; *United States v. Crosby,* Fed. Cas. No. 14,893; *Felix v. United States,* 186 Fed. Rep. 685; *United States v. Stone,* 188 Fed. Rep. 836; *Aczel v. United States,* 232 Fed. Rep. 652; *United States v. Waddell,* 112 U. S. 76; *Haynes v. United States,* 101 Fed. Rep. 817; *Buchanan v. United States,* 233 Fed. Rep. 257; *Logan v. United States,* 144 U. S. 263; *In re Quarles,* 158 U. S. 532; *Motes v. United States,* 178 U. S. 458; *United States v. Lancaster,* 44 Fed. Rep. 885, 896; *United States v. Patrick,* 54 Fed. Rep. 338; *Davis v. United States,* 107 Fed. Rep. 753; *United States v. Morris,* 125 Fed. Rep. 322; *Smith v. United States,* 157 Fed. Rep. 721.

As examples of prosecutions which have failed because of the prosecutor's inability to point out, to the satisfaction of the court, the constitutional provision securing the right said to have been conspired against, see: *United States v. Cruikshank,* 92 U. S. 542; *Hodges v. United States,* 203 U. S. 1; *United States v. Gradwell,* 243 U. S. 476; *Karem v. United States,* 121 Fed. Rep. 250; *McKenna v. United States,* 127 Fed. Rep. 88; *United States v. Eberhart,* 127 Fed. Rep. 254; *United States v. Moore,* 129 Fed. Rep. 630; *United States v. Powell,* 151 Fed. Rep. 648, affd. 212 U. S. 564; *United States v. Bathgate,* 246 U. S. 220.

The right of a citizen of the United States to reside and work within the bounds of the United States wherever he may choose is a fundamental right pertaining to his individual liberty. Like other fundamental rights of life, liberty, and property, so far as interference therewith on the part of individuals is concerned, it is a right which the Constitution of the United States leaves to the protection of the several States having jurisdiction. So far as there is a right pertaining to federal citizenship to have free ingress or egress with respect to the several States, the right is

essentially one of protection against the action of the States themselves and of those acting under their authority. *Slaughter-House Cases,* 16 Wall. 36, 76; *Corfield* v. *Coryell,* 4 Wash. C. C. 371.

The privileges and immunities clause of Art. IV, § 2, does not confer a right of protection against the acts of individuals, but is aimed at the hostile action of the States. It is this clause which gives the citizens of the several States "the right of free ingress into other States, and egress from them." *Paul* v. *Virginia,* 8 Wall. 168, 180; *Slaughter-House Cases,* 16 Wall. 36, 75; *Corfield* v. *Coryell,* 4 Wash. C. C. 371, 381; *Ward* v. *Maryland,* 12 Wall. 418, 430. It confers no right whatever with respect to the action of individuals, but only affords protection as against the hostile action of the States and their agencies. *Slaughter-House Cases, supra,* 76, 77; *United States* v. *Harris,* 106 U. S. 629, 643. See also, *Hodges* v. *United States,* 203 U. S. 1, 15.

The provisions of the Fourteenth Amendment are also concerned with action by the States and do not confer a federal right to protection as against the action of individuals, in the absence of action by a State. *Slaughter-House Cases, supra,* 77; *Civil Rights Cases, supra,* 11; *United States* v. *Cruikshank,* 92 U. S. 542, 555. See also *Virginia* v. *Rives, supra,* and *United States* v. *Harris, supra.*

If it be assumed that, apart from § 2 of Art. IV and the Fourteenth Amendment, there is an inherent federal right of a citizen of the United States freely to cross the boundary of a State, it is of the essence of that right that it is one which exists only with respect to action by the States and their agencies. So far as mere individual liberty is concerned, in the absence of action by the States, the State boundary has no significance.

In dealing with the offense of kidnapping or of false imprisonment or of libel or of assault or of murder, where the State and its agencies are not the actors, the state

boundary is of no significance, and personal right is protected, as it always has been protected, under the laws of the State having jurisdiction.    We find nothing in *Crandall* v. *Nevada*, 6 Wall. 35, which in any way contravenes this well-settled distinction.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The case is here under the Criminal Appeals Act to directly review a judgment quashing an indictment against the 25 persons who are defendants in error. The indictment contained four counts, but as the fourth is now abandoned by the Government we need not consider it.

The first count charged the accused with conspiring, in violation of § 19 of the Criminal Code, to injure, oppress, threaten, or intimidate 221 named persons, alleged to be citizens of the United States residing in Arizona, of rights or privileges secured to them by the Constitution or laws of the United States, that is to say, the right and privilege pertaining to citizens of said State peacefully to reside and remain therein and to be immune from unlawful deportation from that State to another. And the overt acts alleged were: The arming of the conspirators; the seizure and holding of the persons named until by means of a railway train procured for that purpose they were forcibly transported into New Mexico and in that State released under threat of death or great bodily harm should they ever return to the State of Arizona.

The second count was the same as the first except that only 25 of the persons alleged in the first count to have been injured were named, and they were stated to be citizens of the United States residing in but not citizens of the State of Arizona.

The third count was also identical with the first except that it embraced only 196 of the injured persons named in

the first count and one additional person not therein named, all being declared to be citizens of the United States and of the State of Arizona residing in that State.

The court quashed the indictment on the ground that no power had been delegated by the Constitution to the United States to forbid and punish the wrongful acts complained of, as the right to do so was exclusively within the authority reserved by that instrument to the several States. As the entire case will be disposed of by testing the accuracy of this view we come immediately to consider that subject.

In argument the asserted error in the conclusion is based, not upon the direct result of any particular provision of the Constitution, but upon implications arising from that instrument as a whole, the conditions existing at the time of its adoption, and the consequences inevitably produced from the creation by it of the Government of the United States. A wide field of inquiry common to all the contentions is thus opened. In order, therefore, to afford a common basis by which to measure the correctness of the various implications insisted upon, we state under separate headings doctrines which are applicable to all the contentions and which are in reason so well founded and so conclusively sustained by authority as to be indisputable.

(a) In all the States from the beginning down to the adoption of the Articles of Confederation the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective States, to move at will from place to place therein, and to have free ingress thereto and egress therefrom, with a consequent authority in the States to forbid and punish violations of this fundamental right. *Corfield* v. *Coryell*, 4 Wash. C. C. 371, 380–381; *Slaughter-House Cases*, 16 Wall. 36, 76.

(b) Whether, in disregard of the principles of comity, any of the States recognized in their own citizens rights on

this subject which they refused to grant to citizens of other States, we need not consider, in view of the provision of the Articles of Confederation on the subject. By that provision uniformity was secured, not by lodging power in Congress to deal with the subject, but, while reserving in the several States the authority which they had theretofore enjoyed, yet subjecting such authority to a limitation inhibiting the power from being used to discriminate. The text of Article IV which provides for this subject is as follows:

"The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, . . ."

Thus, while power remained in the several States, the boundaries demarking them became, at least for the purpose of the enjoyment of the right here in question, negligible, and the frontiers of the Confederation became the measure of the equal right secured to the inhabitants of each and all the States.

(c) That the Constitution plainly intended to preserve and enforce the limitation as to discrimination imposed upon the States by Article IV of the Articles of Confederation, and thus necessarily assumed the continued possession by the States of the reserved power to deal with free residence, ingress and egress, cannot be denied for the following reasons: (1) Because the text of Article IV, § 2, of the Constitution, makes manifest that it was drawn with reference to the corresponding clause of the Articles of Confederation and was intended to perpetuate its limitations; and (2) because that view has been so conclusively settled as to leave no room for controversy. Thus

in *Paul* v. *Virginia*, 8 Wall. 168, 180, considering the operation and effect of Article IV, § 2, of the Constitution, it was said:

"It was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this.

"Indeed, without some provision of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privileges with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists."

Again, in *Ward* v. *Maryland*, 12 Wall. 418, 430, upon the same subject, the court declared:

"Attempt will not be made to define the words 'privileges and immunities,' or to specify the rights which they are intended to secure and protect, beyond what may be necessary to the decision of the case before the court. Beyond doubt those words are words of very comprehensive meaning, but it will be sufficient to say that the clause plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of the Union for the purpose of engaging in lawful commerce, trade, or business without molestation; to acquire per-

sonal property; to take and hold real estate; to maintain actions in the courts of the State; and to be exempt from any higher taxes or excises than are imposed by the State upon its own citizens."

In the *Slaughter-House Cases,* 16 Wall. 36, 75–76, the court, after reciting both the provisions of Article IV of the Articles of Confederation and Article IV, § 2, of the Constitution, said:

"There can be but little question that the purpose of both these provisions is the same, and that the privileges and immunities intended are the same in each. In the article of the Confederation we have some of these specifically mentioned, and enough perhaps to give some general idea of the class of civil rights meant by the phrase.

"Fortunately we are not without judicial construction of this clause of the Constitution. The first and the leading case on the subject is that of *Corfield* v. *Coryell,* decided by Mr. Justice Washington in the Circuit Court for the District of Pennsylvania in 1823.

"'The inquiry,' he says 'is, what are the privileges and immunities of citizens of the several States? We feel no hesitation in confining these expressions to those privileges and immunities which are *fundamental;* which belong of right to the citizens of all free governments, and which have at all times been enjoyed by citizens of the several States which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would be more tedious than difficult to enumerate. They may all, however, be comprehended under the following general heads: protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole.'

"This definition of the privileges and immunities of citizens of the States is adopted in the main by this court in the recent case of *Ward* v. *The State of Maryland,* while it declines to undertake an authoritative definition beyond what was necessary to that decision. The description, when taken to include others not named, but which are of the same general character, embraces nearly every civil right for the establishment and protection of which organized government is instituted. They are, in the language of Judge Washington, those rights which are fundamental. Throughout his opinion, they are spoken of as rights belonging to the individual as a citizen of a State. They are so spoken of in the constitutional provision which he was construing. And they have always been held to be the class of rights which the State governments were created to establish and secure."

The controlling influence of the opinion in the *Slaughter-House Cases,* as well as that of Mr. Justice Washington in *Corfield* v. *Coryell,* stands out in bolder relief when it is observed that in the latter case, following the statement of the general principles contained in the passage quoted in the *Slaughter-House Cases,* there is found, by way of illustration, an enumeration of particular rights declared to be clearly embraced by the general principles, one of which is described as, "The right of a citizen of one state to pass through, or reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise."

Applying these doctrines, let us come to test the soundness of the implications from the Constitution relied upon to establish the absence of all state authority to deal with the individual wrongs complained of, and the possession by the Federal Government of power for that purpose; and, as pertinent thereto, to refer briefly to the authorities which it is assumed sustain those implications.

Undoubtedly the right of citizens of the States to reside peacefully in, and to have free ingress into and egress from,

the several States had, prior to the Confederation, a two-fold aspect: (1) as possessed in their own States and (2) as enjoyed in virtue of the comity of other States. But although the Constitution fused these distinct rights into one by providing that one State should not deny to the citizens of other States rights given to its own citizens, no basis is afforded for contending that a wrongful prevention by an individual of the enjoyment by a citizen of one State in another of rights possessed in that State by its own citizens was a violation of a right afforded by the Constitution. This is the necessary result of Article IV, § 2, which reserves to the several States authority over the subject, limited by the restriction against state discriminatory action, hence excluding federal authority except where invoked to enforce the limitation, which is not here the case; a conclusion expressly sustained by the ruling in *United States* v. *Harris*, 106 U. S. 629, 645, to the effect that the second section of Article IV, like the Fourteenth Amendment, is directed alone against state action. And this was but a summary of what had been previously pointed out in the *Slaughter-House Cases*, 16 Wall. 36, where in dealing with the privileges and immunities embraced by Article IV, § 2, of the Constitution, it was observed (p. 77):

"It would be the vainest show of learning to attempt to prove by citations of authority, that up to the adoption of the recent amendments, no claim or pretence was set up that those rights depended on the Federal government for their existence or protection, beyond the very few express limitations which the Federal Constitution imposed upon the States—such, for instance, as the prohibition against ex post facto laws, bills of attainder, and laws impairing the obligation of contracts. But with the exception of these and a few other restrictions, the entire domain of the privileges and immunities of citizens of the States, as above defined, lay within the constitutional and legislative power

of the States, and without that of the Federal government."

Nor is the situation changed by assuming that as a State has the power, by depriving its own citizens of the right to reside peacefully therein and to free ingress thereto and egress therefrom, it may, without violating the prohibitions of Article IV against discrimination, apply a like rule to citizens of other States, and hence engender, outside of Article IV, a federal right. This must be so since the proposition assumes that a State could, without violating the fundamental limitations of the Constitution other than those of Article IV, § 2, enact legislation incompatible with its existence as a free government and destructive of the fundamental rights of its citizens; and furthermore, because the premise upon which the proposition rests is state action and the existence of federal power to determine the repugnancy of such action to the Constitution, matters which, not being here involved, are not disputed.

This leads us furthermore to point out that the case of *Crandall* v. *Nevada*, 6 Wall. 35, so much relied upon in the argument, is inapplicable, not only because it involved the validity of state action, but because the state statute considered in that case was held to directly burden the performance by the United States of its governmental functions and also to limit rights of the citizens growing out of such functions; and hence it also follows that the observation made in *Twining* v. *New Jersey*, 211 U. S. 78, 97, to the effect that it had been held in the *Crandall Case* that the privilege of passing from State to State is an attribute of national citizenship, may here be put out of view as inapposite.

With the object of confining our decision to the case before us, we say that nothing we have stated must be considered as implying a want of power in the United States to restrain acts which, although involving ingress or

egress into or from a State, have for their direct and neces-sary effect an interference with the performance of duties which it is incumbent upon the United States to discharge, as illustrated in the *Crandall Case, supra.*

*Judgment affirmed.*

MR. JUSTICE CLARKE dissents.