EDWARDS *v.* CALIFORNIA.

No. 17.  Argued April 28, 29, 1941.  Reargued October 21, 1941.— Decided November 24, 1941.

*Mr. Samuel Slaff* for the appellant.

162

164

*Mr. Charles A. Wetmore, Jr.* submitted on the original argument for appellee.

168

*Mr. W. T. Sweigert,* Assistant Attorney General of California, with whom *Messrs. Earl Warren,* Attorney General, and *Hiram W. Johnson, 3rd,* Deputy Attorney General, were on the brief, on the reargument, for appellee.

170

Mr. Justice Byrnes delivered the opinion of the Court.

The facts of this case are simple and are not disputed. Appellant is a citizen of the United States and a resident of California. In December, 1939, he left his home in Marysville, California, for Spur, Texas, with the intention of bringing back to Marysville his wife's brother, Frank Duncan, a citizen of the United States and a resident of Texas.

When he arrived in Texas, appellant learned that Duncan had last been employed by the Works Progress Administration. Appellant thus became aware of the fact that Duncan was an indigent person and he continued to be aware of it throughout the period involved in this case. The two men agreed that appellant should transport Duncan from Texas to Marysville in appellant's automobile. Accordingly, they left Spur on January 1, 1940, entered California by way of Arizona on January 3, and reached Marysville on January 5. When he left Texas, Duncan had about $20. It had all been spent by the time he reached Marysville. He lived with appellant for about ten days until he obtained financial assistance from the Farm Security Administration. During the ten day interval, he had no employment.

In Justice Court a complaint was filed against appellant under § 2615 of the Welfare and Institutions Code of California, which provides: "Every person, firm or corporation or officer or agent thereof that brings or assists in bringing into the State any indigent person who is not a resident of the State, knowing him to be an indigent person, is guilty of a misdemeanor." On demurrer to the complaint, appellant urged that the Section violated several provisions of the Federal Constitution. The demurrer was overruled, the cause was tried, appellant was convicted and sentenced to six months imprisonment in the county jail, and sentence was suspended.

On appeal to the Superior Court of Yuba County, the facts as stated above were stipulated. The Superior Court, although regarding as "close" the question of the validity of the Section, felt "constrained to uphold the statute as a valid exercise of the police power of the State of California." Consequently, the conviction was affirmed. No appeal to a higher state court was open to appellant. We noted probable jurisdiction early last

term, and later ordered reargument (313 U. S. 545) which has been held.

At the threshold of our inquiry a question arises with respect to the interpretation of § 2615. On reargument, the Attorney General of California has submitted an exposition of the history of the Section, which reveals that statutes similar, though not identical, to it have been in effect in California since 1860. (See Cal. Stat. (1860) 213; Cal. Stat. (1901) 636; Cal. Stat. (1933) 2005). Neither under these forerunners nor under § 2615 itself does the term "indigent person" seem to have been accorded an authoritative interpretation by the California courts. The appellee claims for the Section a very limited scope. It urges that the term "indigent person" must be taken to include only persons who are presently destitute of property and without resources to obtain the necessities of life, and who have no relatives or friends able and willing to support them. It is conceded, however, that the term is not confined to those who are physically or mentally incapacitated. While the generality of the language of the Section contains no hint of these limitations, we are content to assign to the term this narrow meaning.

Article I, § 8 of the Constitution delegates to the Congress the authority to regulate interstate commerce. And it is settled beyond question that the transportation of persons is "commerce," within the meaning of that provision.[1] It is nevertheless true, that the States are not wholly precluded from exercising their police power in matters of local concern even though they may thereby affect inter-

---

[1] *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 203; *Leisy* v. *Hardin,* 135 U. S. 100, 112; *Covington Bridge Co.* v. *Kentucky,* 154 U. S. 204, 218; *Hoke* v. *United States,* 227 U. S. 308, 320; *Caminetti* v. *United States,* 242 U. S. 470, 491; *United States* v. *Hill,* 248 U. S. 420, 423; *Mitchell* v. *United States,* 313 U. S. 80. Cf. The Federal Kidnaping Act of 1932, U. S. C., Title 18, §§ 408a–408c. It is immaterial whether or not the transportation is commercial in character. See *Caminetti* v. *United States, supra.*

state commerce. *California* v. *Thompson,* 313 U. S. 109, 113. The issue presented in this case, therefore, is whether the prohibition embodied in § 2615 against the "bringing" or transportation of indigent persons into California is within the police power of that State. We think that it is not, and hold that it is an unconstitutional barrier to interstate commerce.

The grave and perplexing social and economic dislocation which this statute reflects is a matter of common knowledge and concern. We are not unmindful of it. We appreciate that the spectacle of large segments of our population constantly on the move has given rise to urgent demands upon the ingenuity of government. Both the brief of the Attorney General of California and that of the Chairman of the Select Committee of the House of Representatives of the United States, as *amicus curiae,* have sharpened this appreciation. The State asserts that the huge influx of migrants into California in recent years has resulted in problems of health, morals, and especially finance, the proportions of which are staggering. It is not for us to say that this is not true. We have repeatedly and recently affirmed, and we now reaffirm, that we do not conceive it our function to pass upon "the wisdom, need, or appropriateness" of the legislative efforts of the States to solve such difficulties. See *Olsen* v. *Nebraska,* 313 U. S. 236, 246.

But this does not mean that there are no boundaries to the permissible area of State legislative activity. There are. And none is more certain than the prohibition against attempts on the part of any single State to isolate itself from difficulties common to all of them by restraining the transportation of persons and property across its borders. It is frequently the case that a State might gain a momentary respite from the pressure of events by the simple expedient of shutting its gates to the outside world. But, in the words of Mr. Justice Cardozo: "The Constitution was

framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several States must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *Seelig*, 294 U. S. 511, 523.

It is difficult to conceive of a statute more squarely in conflict with this theory than the Section challenged here. Its express purpose and inevitable effect is to prohibit the transportation of indigent persons across the California border. The burden upon interstate commerce is intended and immediate; it is the plain and sole function of the statute. Moreover, the indigent non-residents who are the real victims of the statute are deprived of the opportunity to exert political pressure upon the California legislature in order to obtain a change in policy. *South Carolina Highway Dept.* v. *Barnwell Bros.*, 303 U. S. 177, 185, n. 2. We think this statute must fail under any known test of the validity of State interference with interstate commerce.

It is urged, however, that the concept which underlies § 2615 enjoys a firm basis in English and American history.[2] This is the notion that each community should care for its own indigent, that relief is solely the responsibility of local government. Of this it must first be said that we are not now called upon to determine anything other than the propriety of an attempt by a State to prohibit the transportation of indigent non-residents into its territory. The nature and extent of its obligation to afford relief to newcomers is not here involved. We do, however, suggest that the theory of the Elizabethan poor laws no longer fits the facts. Recent years, and particularly the past decade, have been marked by a growing recognition that in an industrial society the task of pro-

---

[2] See Hirsch, H. M., *Our Settlement Laws* (N. Y. Dept. of Social Welfare, 1933), *passim*.

viding assistance to the needy has ceased to be local in character. The duty to share the burden, if not wholly to assume it, has been recognized not only by State governments, but by the Federal government as well. The changed attitude is reflected in the Social Security laws under which the Federal and State governments coöperate for the care of the aged, the blind and dependent children. U. S. C., Title 42, §§ 301–1307, esp. §§ 301, 501, 601, 701, 721, 801, 1201. It is reflected in the works programs under which work is furnished the unemployed, with the States supplying approximately 25% and the Federal government approximately 75% of the cost. See, *e. g.*, Joint Resolution of June 26, 1940, c. 432, § 1 (d), 54 Stat. 611, 613. It is further reflected in the Farm Security laws, under which the entire cost of the relief provisions is borne by the Federal government. *Id.*, at §§ 2 (a), 2 (b), 2 (d).

Indeed, the record in this very case illustrates the inadequate basis in fact for the theory that relief is presently a local matter. Before leaving Texas, Duncan had received assistance from the Works Progress Administration. After arriving in California he was aided by the Farm Security Administration, which, as we have said, is wholly financed by the Federal government. This is not to say that our judgment would be different if Duncan had received relief from local agencies in Texas and California. Nor is it to suggest that the financial burden of assistance to indigent persons does not continue to fall heavily upon local and State governments. It is only to illustrate that in not inconsiderable measure the relief of the needy has become the common responsibility and concern of the whole nation.

What has been said with respect to financing relief is not without its bearing upon the regulation of the transportation of indigent persons. For the social phenomenon of large-scale interstate migration is as certainly a matter of national concern as the provision of assistance to those who have found a permanent or temporary abode.

Moreover, and unlike the relief problem, this phenomenon does not admit of diverse treatment by the several States. The prohibition against transporting indigent non-residents into one State is an open invitation to retaliatory measures, and the burdens upon the transportation of such persons become cumulative. Moreover, it would be a virtual impossibility for migrants and those who transport them to acquaint themselves with the peculiar rules of admission of many States. "This Court has repeatedly declared that the grant [the commerce clause] established the immunity of interstate commerce from the control of the States respecting all those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation must be prescribed by a single authority." *Milk Control Board* v. *Eisenberg Farm Products*, 306 U. S. 346, 351. We are of the opinion that the transportation of indigent persons from State to State clearly falls within this class of subjects. The scope of Congressional power to deal with this problem we are not now called upon to decide.

There remains to be noticed only the contention that the limitation upon State power to interfere with the interstate transportation of persons is subject to an exception in the case of "paupers." It is true that support for this contention may be found in early decisions of this Court. In *City of New York* v. *Miln*, 11 Pet. 102, at 143, it was said that it is "as competent and as necessary for a State to provide precautionary measures against the moral pestilence of paupers, vagabonds, and possibly convicts, as it is to guard against the physical pestilence, which may arise from unsound and infectious articles imported, . . ." This language has been casually repeated in numerous later cases up to the turn of the century. See, *e. g., Passenger Cases*, 7 How. 283, 426 and 466–467; *Railway Company* v. *Husen*, 95 U. S. 465, 471; *Plumley* v. *Massachusetts*, 155 U. S. 461, 478; *Missouri, K. & T. Ry.*

*Co.* v. *Haber,* 169 U. S. 613, 629. In none of these cases, however, was the power of a State to exclude "paupers" actually involved.

Whether an able-bodied but unemployed person like Duncan is a "pauper" within the historical meaning of the term is open to considerable doubt. See 53 Harvard L. Rev. 1031, 1032. But assuming that the term is applicable to him and to persons similarly situated, we do not consider ourselves bound by the language referred to. *City of New York* v. *Miln* was decided in 1837. Whatever may have been the notion then prevailing, we do not think that it will now be seriously contended that because a person is without employment and without funds he constitutes a "moral pestilence." Poverty and immorality are not synonymous.

We are of the opinion that § 2615 is not a valid exercise of the police power of California; that it imposes an unconstitutional burden upon interstate commerce, and that the conviction under it cannot be sustained. In the view we have taken it is unnecessary to decide whether the Section is repugnant to other provisions of the Constitution.

*Reversed.*

MR. JUSTICE DOUGLAS, concurring:

I express no view on whether or not the statute here in question runs afoul of Art. I, § 8 of the Constitution granting to Congress the power "to regulate Commerce with foreign Nations, and among the several States." But I am of the opinion that the right of persons to move freely from State to State occupies a more protected position in our constitutional system than does the movement of cattle, fruit, steel and coal across state lines. While the opinion of the Court expresses no view on that issue, the right involved is so fundamental that I deem it appropriate to indicate the reach of the constitutional question which is present.

The right to move freely from State to State is an incident of *national* citizenship protected by the privileges and immunities clause of the Fourteenth Amendment against state interference. Mr. Justice Moody in *Twining* v. *New Jersey,* 211 U. S. 78, 97, stated, "Privileges and immunities of citizens of the United States . . . are only such as arise out of the nature and essential character of the National Government, or are specifically granted or secured to all citizens or persons by the Constitution of the United States." And he went on to state that one of those rights of *national* citizenship was "the right to pass freely from State to State." *Id.,* p. 97. Now it is apparent that this right is not specifically granted by the Constitution. Yet before the Fourteenth Amendment it was recognized as a right fundamental to the national character of our Federal government. It was so decided in 1867 by *Crandall* v. *Nevada,* 6 Wall. 35. In that case this Court struck down a Nevada tax "upon every person leaving the State" by common carrier. Mr. Justice Miller writing for the Court held that the right to move freely throughout the nation was a right of *national* citizenship. That the right was implied did not make it any the less "guaranteed" by the Constitution. *Id.,* p. 47. To be sure, he emphasized that the Nevada statute would obstruct the right of a citizen to travel to the seat of his national government or its offices throughout the country. And see *United States* v. *Wheeler,* 254 U. S. 281, 299. But there is not a shred of evidence in the record of the *Crandall* case that the persons there involved were en route on any such mission any more than it appears in this case that Duncan entered California to interview some federal agency. The point which Mr. Justice Miller made was merely in illustration of the damage and havoc which would ensue if the States had the power to prevent the free movement of citizens from one State to another.

This is emphasized by his quotation from Chief Justice Taney's dissenting opinion in the *Passenger Cases*, 7 How. 283, 492: "We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." Hence the *dictum* in *United States* v. *Wheeler, supra,* p. 299, which attempts to limit the *Crandall* case to a holding that the statute in question directly burdened "the performance by the United States of its governmental functions" and limited the "rights of the citizens growing out of such functions," does not bear analysis.

So, when the Fourteenth Amendment was adopted in 1868, it had been squarely and authoritatively settled that the right to move freely from State to State was a right of *national* citizenship. As such it was protected by the privileges and immunities clause of the Fourteenth Amendment against state interference. *Slaughter House Cases,* 16 Wall. 36, 74, 79. In the latter case Mr. Justice Miller recognized that it was so "protected by implied guarantees" of the Constitution. *Id.,* p. 79. That was also acknowledged in *Twining* v. *New Jersey, supra.* And Chief Justice Fuller in *Williams* v. *Fears,* 179 U. S. 270, 274, stated: "Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the Fourteenth Amendment and by other provisions of the Constitution."

In the face of this history I cannot accede to the suggestion (*Helson & Randolph* v. *Kentucky,* 279 U. S. 245, 251; *Colgate* v. *Harvey,* 296 U. S. 404, 444) that the commerce clause is the appropriate explanation of *Crandall* v. *Nevada, supra.* Two of the Justices in that case expressly

put the decision on the commerce clause; the others put it on the broader ground of rights of *national* citizenship, Mr. Justice Miller stating that "we do not concede that the question before us is to be determined" by the commerce clause. *Id.*, p. 43. On that broader ground it should continue to rest.

To be sure, there are expressions in the cases that this right of free movement of persons is an incident of *state* citizenship protected against discriminatory state action by Art. IV, § 2 of the Constitution. *Corfield* v. *Coryell*, 4 Wash. C. C. 371, 381; *Paul* v. *Virginia*, 8 Wall. 168, 180; *Ward* v. *Maryland*, 12 Wall. 418, 430; *United States* v. *Wheeler, supra*, pp. 298–299. Under the *dicta* of those cases the statute in the instant case would not survive, since California is curtailing only the free movement of indigents who are non-residents of that State. But the thrust of the *Crandall* case is deeper. Mr. Justice Miller adverted to *Corfield* v. *Coryell, Paul* v. *Virginia*, and *Ward* v. *Maryland*, when he stated in the *Slaughter House Cases* that the right protected by the *Crandall* case was a right of *national* citizenship arising from the "implied guarantees" of the Constitution. 16 Wall. at pp. 75–79. But his failure to classify that right as one of *state* citizenship protected solely by Art. IV, § 2, underscores his view that the free movement of persons throughout this nation was a right of *national* citizenship. It likewise emphasizes that Art. IV, § 2, whatever its reach, is primarily concerned with the incidents of residence (the matter involved in *United States* v. *Wheeler, supra*) and the exercise of rights within a State, so that a citizen of one State is not in a "condition of alienage when he is within or when he removes to another State." *Blake* v. *McClung*, 172 U. S. 239, 256. Furthermore, Art. IV, § 2, cannot explain the *Crandall* decision. The statute in that case applied to citizens of Nevada as well as to citizens of

other States.   That is to say, Nevada was not "discriminating against citizens of other States in favor of its own." *Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, 511 and cases cited.   Thus it is plain that the right of free ingress and egress rises to a higher constitutional dignity than that afforded by *state* citizenship.

The conclusion that the right of free movement is a right of *national* citizenship stands on firm historical ground.   If a state tax on that movement, as in the *Crandall* case, is invalid, *a fortiori* a state statute which obstructs or in substance prevents that movement must fall. That result necessarily follows unless perchance a State can curtail the right of free movement of those who are poor or destitute.   But to allow such an exception to be engrafted on the rights of *national* citizenship would be to contravene every conception of national unity.   It would also introduce a caste system utterly incompatible with the spirit of our system of government.   It would permit those who were stigmatized by a State as indigents, paupers, or vagabonds to be relegated to an inferior class of citizenship.   It would prevent a citizen because he was poor from seeking new horizons in other States.   It might thus withhold from large segments of our people that mobility which is basic to any guarantee of freedom of opportunity.   The result would be a substantial dilution of the rights of *national* citizenship, a serious impairment of the principles of equality.   Since the state statute here challenged involves such consequences, it runs afoul of the privileges and immunities clause of the Fourteenth Amendment.

MR. JUSTICE BLACK and MR. JUSTICE MURPHY join in this opinion.

MR. JUSTICE JACKSON, concurring:

I concur in the result reached by the Court, and I agree that the grounds of its decision are permissible ones under

applicable authorities. But the migrations of a human being, of whom it is charged that he possesses nothing that can be sold and has no wherewithal to buy, do not fit easily into my notions as to what is commerce. To hold that the measure of his rights is the commerce clause is likely to result eventually either in distorting the commercial law or in denaturing human rights. I turn, therefore, away from principles by which commerce is regulated to that clause of the Constitution by virtue of which Duncan is a citizen of the United States and which forbids any State to abridge his privileges or immunities as such.

This clause was adopted to make United States citizenship the dominant and paramount allegiance among us. The return which the law had long associated with allegiance was protection. The power of citizenship as a shield against oppression was widely known from the example of Paul's Roman citizenship, which sent the centurion scurrying to his higher-ups with the message: "Take heed what thou doest: for this man is a Roman." I suppose none of us doubts that the hope of imparting to American citizenship some of this vitality was the purpose of declaring in the Fourteenth Amendment: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . ."

But the hope proclaimed in such generality soon shriveled in the process of judicial interpretation. For nearly three-quarters of a century this Court rejected every plea to the privileges and immunities clause. The judicial history of this clause and the very real difficulties in the way of its practical application to specific cases have been too well and recently reviewed to warrant repetition.[1]

[1] See dissenting opinion of Mr. Justice Stone in *Colgate* v. *Harvey*, 296 U. S. 404, 436, *et seq.*

While instances of valid "privileges or immunities" must be but few, I am convinced that this is one. I do not ignore or belittle the difficulties of what has been characterized by this Court as an "almost forgotten" clause. But the difficulty of the task does not excuse us from giving these general and abstract words whatever of specific content and concreteness they will bear as we mark out their application, case by case. That is the method of the common law, and it has been the method of this Court with other no less general statements in our fundamental law. This Court has not been timorous about giving concrete meaning to such obscure and vagrant phrases as "due process," "general welfare," "equal protection," or even "commerce among the several States." But it has always hesitated to give any real meaning to the privileges and immunities clause lest it improvidently give too much.

This Court should, however, hold squarely that it is a privilege of citizenship of the United States, protected from state abridgment, to enter any state of the Union, either for temporary sojourn or for the establishment of permanent residence therein and for gaining resultant citizenship thereof. If national citizenship means less than this, it means nothing.

The language of the Fourteenth Amendment declaring two kinds of citizenship is discriminating. It is: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." While it thus establishes national citizenship from the mere circumstance of birth within the territory and jurisdiction of the United States, birth within a state does not establish citizenship thereof. State citizenship is ephemeral. It results only from residence and is gained or lost therewith. That choice of residence was subject to local approval is contrary to the inescapable implications of the westward movement of our civilization.

Even as to an alien who had "been admitted to the United States under the Federal law," this Court, through Mr. Justice Hughes, declared that "He was thus admitted with the privilege of entering and abiding in the United States, and hence of entering and abiding in any State in the Union." *Truax* v. *Raich*, 239 U. S. 33, 39. Why we should hesitate to hold that federal citizenship implies rights to enter and abide in any state of the Union at least equal to those possessed by aliens passes my understanding. The world is even more upside down than I had supposed it to be, if California must accept aliens in deference to their federal privileges but is free to turn back citizens of the United States unless we treat them as subjects of commerce.

The right of the citizen to migrate from state to state which, I agree with MR. JUSTICE DOUGLAS, is shown by our precedents to be one of national citizenship, is not, however, an unlimited one. In addition to being subject to all constitutional limitations imposed by the federal government, such citizen is subject to some control by state governments. He may not, if a fugitive from justice, claim freedom to migrate unmolested, nor may he endanger others by carrying contagion about. These causes, and perhaps others that do not occur to me now, warrant any public authority in stopping a man where it finds him and arresting his progress across a state line quite as much as from place to place within the state.

It is here that we meet the real crux of this case. Does "indigence" as defined by the application of the California statute constitute a basis for restricting the freedom of a citizen, as crime or contagion warrants its restriction? We should say now, and in no uncertain terms, that a man's mere property status, without more, cannot be used by a state to test, qualify, or limit his rights as a citizen of the United States. "Indigence" in itself is neither a source of rights nor a basis for denying them. The mere

state of being without funds is a neutral fact—constitutionally an irrelevance, like race, creed, or color. I agree with what I understand to be the holding of the Court that cases which may indicate the contrary are overruled.

Any measure which would divide our citizenry on the basis of property into one class free to move from state to state and another class that is poverty-bound to the place where it has suffered misfortune is not only at war with the habit and custom by which our country has expanded, but is also a short-sighted blow at the security of property itself. Property can have no more dangerous, even if unwitting, enemy than one who would make its possession a pretext for unequal or exclusive civil rights. Where those rights are derived from national citizenship no state may impose such a test, and whether the Congress could do so we are not called upon to inquire.

I think California had no right to make the condition of Duncan's purse, with no evidence of violation by him of any law or social policy which caused it, the basis of excluding him or of punishing one who extended him aid.

If I doubted whether his federal citizenship alone were enough to open the gates of California to Duncan, my doubt would disappear on consideration of the obligations of such citizenship. Duncan owes a duty to render military service, and this Court has said that this duty is the result of his citizenship. Mr. Chief Justice White declared in the *Selective Draft Law Cases,* 245 U. S. 366, 378: "It may not be doubted that the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need and the right to compel it." A contention that a citizen's duty to render military service is suspended by "indigence" would meet with little favor. Rich or penniless, Duncan's citizenship under the Con-

stitution pledges his strength to the defense of California as a part of the United States, and his right to migrate to any part of the land he must defend is something she must respect under the same instrument. Unless this Court is willing to say that citizenship of the United States means at least this much to the citizen, then our heritage of constitutional privileges and immunities is only a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will.