Justine Wise Polier, J.
Jane, a little girl three years of age, was the youngest of six children brought before this court in March, 1964 on a neglect petition filed by the Society for the Prevention of Cruelty to Children against both parents. A finding of neglect was entered in May. Five of the children were paroled to the mother pending full study. The sixth had been certified as mentally defective arid placed in a State institution. In the meantime, the father had been found guilty on a morals charge for abuse of the mentally defective child and had been sentenced to the Workhouse. There was also a long history of excessive drinking by both parents and physical abuse of the mother by the father.
On August 28, 1964 this court was advised that the mother had died of a heart attack. Neighbors had taken the children in temporarily. The father was in prison. The day after the mother’s funeral, a maternal aunt who resided in Detroit appeared in court and offered to provide for Jane in the home of her married daughter, who also lived in Detroit. An older brother Samuel, 16 years of age, not on the petition, and beyond the jurisdiction of this court, appeared with the maternal aunt and asked to go with her to Detroit since he had no home. A paternal aunt also appeared and expressed interest in taking some of the children to her home in Georgia, but stated she would need public assistance for the children.
The probation record for that day shows that the Probation Officer advised both aunts that the children could go with them only "if the court allowed it, and if they first obtained clearance from the States where they resided. The Probation Officer further advised them that the court could not permit children to go out of the State if public assistance would be needed, as the States to which they went would neither grant assistance nor agree to their coming.
The Presiding Judge agreed to parole the infant Jane to the maternal aunt. The court remanded four of the children to temporary shelter care since there was no home and no responsible relatives with whom these children could be placed in New York. When the Judge learned that there remained a 16-year-old boy, Samuel (who was not within the jurisdiction of the court) whom the maternal aunt was prepared to take to Detroit, he provided funds for his transportation. This was done after the Probation Officer had asked for transportation fare from the Department of Welfare and had been advised that such funds could be granted only after clearance was secured from the State of Michigan and from Detroit. The Probation Officer was further advised that the Department of *235 Welfare would have to assure the Michigan authorities that Samuel would not become a public charge and that this would be a long drawn-out process.
Probation was directed by the court to inquire whether the maternal relatives in Detroit could also provide care for the four children placed in shelter care in New York City. This inquiry made to the Probation Department in the county in which the aunt lived was referred to the County Department of Social Welfare. Two and a half months later a letter was received from the State of Michigan Department of Social Welfare, signed by its interstate consultant, stating that the home in which the little girl had been placed could be approved, but that “ there will be a requirement of interstate agreements being signed or your statement retaining legal liability ”. The same letter stated in regard to the 16-year-old boy:
“ S. does not have Michigan residence, therefore we request his return. It is evident he needs service for which he is not eligible in this State. If you cannot officially return the child to your agency, please determine legal residence.
“We may have to request that Mrs. T. (maternal aunt) return the youngster to whomsoever she received the youngster from, person, organization or agency in New York.”
Neither child was receiving public assistance in Michigan.
The report from the County Department of Social Welfare, dated October 14,1965, warmly approved the home of the maternal cousins who were earing for the three-year-old little girl. This couple was reported to have an immaculate home, to have a joint income of $130 a week and to be planning to move to a larger home with a backyard for the sake of the child.
The home of the maternal aunt who was caring for the 16-year-old boy was disapproved on the ground that she was a domestic employee earning $40 a week and was financially unable to assume responsibility for any of her nieces or nephews. Without explanation it was stated that her home would not be approved “ now or in the future ” for any of the children. The adjustment of the boy was described as poor without reference to the relationship of his attitude and behavior to the death of his mother six weeks earlier. Finally, without regard to the fact that four sisters and brothers were in an emergency shelter and that the father’s criminal record made their return to him impossible, the report dismissed all responsibility for their welfare with the unfounded conclusion that ‘ ‘ The agency in New York appears to have provided a suitable placement which obviously is working out.”
*236 This court finds itself confronted by.a demand that it arrange for the return of a 16-year-old boy who was never within its jurisdiction and chose to go to live with his maternal aunt on the death of his mother, or that this court determine his legal residence. This court has no power to comply with either request.
This court also finds itself confronted with a requirement that it sign an interstate agreement or undertake to retain legal liability for a three-year-old child who is living in an ideal home with a married cousin. The printed guarantee submitted, to this court for signature is alleged to be required concerning the placement of a child from another State as determined by Public Act No. 95 (Mich. Public Acts of 1957, § 14, subd. [d]).[1] The alternative conditions for Jane’s remaining in the home of relatives in Michigan appear to be rooted in and derived from the requirement that a person have settlement as a condition to securing relief or moving if he may need such relief at a future date.
The requirement that a person have “ settlement ” as a condition to securing poor relief goes back to the English Statute of 1662.[2] . Settlement has been interpreted under the traditional poor law statutes enacted by our States as residence for a prescribed period. Many States also followed the English statutes that authorized forced removal of a person, if in the absence of settlement, he became likely to become a public charge.
• State laws to exclude persons who were likely to become public charges were also enacted.[3] These statutes, based on the theory of local responsibility for those in need of “ poor relief ”, were directed toward limiting local responsibility for the poor. In these days one must question the basis for these laws in the light of Federal assistance, the political realities essential to a mobile society, and the constitutional right to personal liberty guaranteed by the Constitution of the United States.
In 1941 the United States Supreme Court by a unanimous decision struck down a California statute making it a misdemeanor to bring into the State any nonresident, knowing him to be indigent. (Edwards v. California, 314 U. S. 160.) At that time, five Justices based their decision on the Commerce Clause, but four-Justices'also declared that the statute violated the Privileges and Immunities Clause of the Fourteenth Amend *237 ment. Justice Douglas, with Justice Black and Justice Murphy concurring, held that the right to move freely is an incident of national citizenship protected by the Fourteenth Amendment. Justice Douglas added (p. 181): “It would also introduce a caste system utterly incompatible with the spirit of our system of government. It would permit those who were stigmatized by a State as indigents, paupers, or vagabonds to be relegated to an inferior class of citizenship. It would prevent a citizen because he was poor from seeking new horizons in other States. It might thus withhold from large segments of our people that mobility which is basic to any guarantee of freedom of opportunity. The result would be a substantial dilution of the rights of national citizenship, a serious impairment of the principles of equality. Since the state statute here challenged involves such consequences, it runs afoul of the privileges and immunities clause of the Fourteenth Amendment.”
Edwards v. California has been properly cited as the first breach in the statutory provisions of the American poor laws which restrict migration of persons who are or may become in need of public support. It has been reported that there has also been a decrease in the use of the exclusion laws by the States since this decision[4] that there has been a tendency of Trial Judges to direct verdicts for the defendants, of juries to acquit persons prosecuted under the exclusion statutes, and that statutes which penalize personal movement have become largely inoperative.[5]
Nevertheless, half of our States have retained compulsory removal laws, patterned on the English Statute of 1662, which authorize compulsory return of a person to his place of “ settlement ’ ’ even though he has not applied for assistance, if, in the phraseology of 1662, he is “ likely to become chargeable ”. Such statutes have rightly been described as “ a potential threat to freedom of movement in America. ’ ’[6]
To this “ potential threat to freedom of movement ” new substantive denials of freedom of movement have been added that bear down heavily on children. In 1935 the Uniform Transfer of Dependents Act was approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association.[7] The model act provided: “ § 1. The [Department of Public Welfare], subject to the approval of the Attorney-General, is hereby authorized to enter into reciprocal *238 agreements with corresponding state agencies of other states regarding the interstate transportation of poor and indigent persons, and to arrange with the proper officials in this state for the acceptance, transfer, and support of persons receiving public aid in other states in accordance with the terms of such reciprocal agreements, provided that this state shall not nor shall any county or other political subdivision of this state be committed to the support of persons who are not in the opinion of said [Department of Public Welfare] entitled to support by the laws of this state.”[8]
In the Commissioners’ Prefatory Note preceding the draft or model act it is noted that:
“ The local thought on this subject [residence requirements for indigent persons] has been so diversified as to make a statutory period of residence in the state a very unsatisfactory basis. By way of illustration it may be said that nine states have no settlement laws, nine states have a residence requirement of six months or less, twenty-one states one year, and nine states from three to ten years.
‘1 In recent years there has been a great change of sentiment as to the basis upon which the transfer of public dependents by the states should be effected, and experience has demonstrated the wisdom of having legislation passed which will enable each state to confer upon its public welfare officials the right to enter into reciprocal agreements for the interchange of dependents, rather than in attempting to have uniform settlement law. While such interstate agreements cannot legally be effected without the consent of Congress, no difficulty has ever been experienced in obtaining Congressional consent to legislation of that character.
“ From a practical standpoint it has been found in a number of the states that a law authorizing the state officials, subject to the approval of the Attorney-General, to enter into reciprocal agreements with corresponding state agencies of other states is the best method yet devised of solving the inherent difficulties of the situation. Hence the following draft of such a law.”[9]
Surely the language in this Prefatory Note is at odds with the position taken in the majority opinion of Justice Bvrxes, who *239 wrote the opinion for the unanimous court, in Edwards v. California (p. 174): “It is urged, however, that the concept which underlies § 2615 enjoys a firm basis in English and American history. This is the notion that each community should care for its own indigent, that relief is solely the responsibility of local government. Of this it must first be said that we are not now called upon to determine anything other than the propriety of an attempt by a State to prohibit the transportation of indigent non-residents into its territory. The nature and extent of its obligation to afford relief to newcomers is not here involved. We do, however, suggest that the theory of the Elizabethan poor laws no longer fit the facts.”
The concept that ‘ ‘ reciprocal agreements for the interchange of dependents ” provides a proper method for State action to control freedom to travel in this country is in absolute conflict with the concurring opinions in the Edwards case. This may be one reason why only one State (California) has enacted the model act since 1941.
Unfortunately, the lack of similar legislation by other States does not mean that the concepts enunciated in either the majority or concurring opinions have been observed or put into practice by the remaining States. Neither New York nor Michigan, the two States involved in the instant case, has enacted a Uniform Transfer of Dependents Act.
In Michigan, additional powers and duties conferred on the State Department of Social Welfare included:
11 Placement of Children.
“(d) To approve the placing of a child in this state in a family home of persons unrelated to the child by a person not a resident of this state * * * by an agency or organization with no place of business in this state. Written approval of the proposed placement shall be obtained from the state department. Such person, agency or organization shall furnish the state department with such information as it may deem necessary regarding the child and the prospective foster parents and such guaranty as is required by the state department to protect the interests of the county in which the child is to be placed.”[10]
This statute, enacted in 1957, is intended to accomplish exactly what the majority opinion in the Edwards case condemned (p. 174) as “ an attempt by a State to prohibit the transportation of indigent non-residents into its territory.” In fact, it goes even further, reverting to the Elizabethan Poor Laws, in *240 seeking to prevent admission even if a child is not a public charge and demanding a guarantee for the future as required by the State Department of Social Welfare.
In New York an additional section of the Social Welfare Law, entitled Interstate Compact on the Placement of Children, was enacted in I960.[11] While the purpose and policy of this act is set forth as co-operation with other States party to the compact “to the end that: (a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment ’ ’[12] the subsequent articles restrict placement, authorize penalties for “ illegal placement ”, and direct that a sending agency “ shall continue to have financial responsibility for support and maintenance ’ ’.[13] The act specifically prohibits placement of a child unless notice in writing is first given to the sending agency by the receiving State “ that the proposed placement does not appear to be contrary to the interests of the child.”[14]
As a matter of practice, even where such compacts have not become effective, the Department of Welfare will not authorize a child going to another State or provide transportation without the consent of the receiving State. The delays resulting force the court to place and retain children in emergency shelters and institutions for months.
In addition, the traditional Elizabethan Poor Laws approach so continues to dominate our Public Welfare Departments that the receiving State generally rejects the home of relatives if they are poor and there is need for public assistance. While. conclusions disapproving the home by the receiving State are often couched in terms of the child’s welfare, the rejecting report is generally based on the economic circumstances of the relatives who have offered to accept the child. The comparative benefits to be derived by the child from living with relatives or being placed in an institution are rarely, if ever, weighed. Without any independent assessment, the Department of Welfare of the sending State accepts the negative decision of the receiving State. In fact it rarely asks for further consideration of the child.
Even in the absence of compacts between two States, it seems that Public Welfare Departments have by “ gentlemen’s agreements ” undertaken that children shall not be sent across State lines if they are subject to the jurisdiction of the Departments *241 of Welfare or the courts. Transportation will not be furnished except with the consent of the receiving States. Interminable delays are tolerated, without regard to the welfare of the child. Thus indigence or poverty constitutes the basis for restricting the freedom of a child who is homeless and the property status is used to limit his rights as a citizen.
The Departments of Welfare have failed to apply the words of Justice Jackson: “ The mere state of being without funds is a neutral fact — constitutionally an irrelevance, like race, creed, or color. I agree with what I understand to be the holding of the Court that cases which may indicate the contrary are overruled.” (Edwards v. California, 314 U. S. 160, 184-185.)
The tragic fact is that by a series of State statutes of removal, exclusion, Uniform Transfer of Dependents Acts, separate statutes, and interstate compacts, the mobility of children in need of placement across State lines is being extensively denied.[15] The practice has become so accepted that social agencies, including the courts, frequently do not even explore the possibilities of homes among relatives in other States for children who must be removed from their own homes because of the death, mental illness or neglect of parents. This denial of the child’s constitutional rights and privileges is not contested. There is no one to speak for the child as a rule, and there is no one to test the constitutionality of the laws under which the child is denied a home.
The case of little Jane raises the question of whether any State can impose conditions that restrict the right of this court to place a child in another State where it is in the best interest of the child to be so placed. The record shows, without dispute, that the cousins are providing an excellent home for this child, *242 and that the child has shown great progress in the home of these relatives. The mother is dead, and the father is not a fit person to provide a home. Indefinite institutional or agency care is the only alternative for this child of three. Yet, the State of Michigan takes the position that while the placement with the cousin can be approved, that there will be a requirement of an interstate agreement being signed or (this) court’s statement retaining legal “ responsibility ” for Jane.
This case does not require that the court determine whether it is authorized to enter into the agreement requested or to sign such a statement. Michigan’s imposition of such a requirement violates the constitutional rights of the child. The demand or requirement of the Michigan statute conflicts with the decision in Edwards v. California. That decision has again recently been cited to hold that the right to travel within the United States is constitutionally protected. (See Zemel v. Bush, 381 U. S. 1.)[16]
Following Jane’s parole to the maternal aunt in Detroit, the child was discharged to the maternal aunt for care on October 7, 1964. Under the Family Court Act where an adjudication of neglect has been entered, this court has the power at a dispositional hearing to discharge the child to the custody of his parents or other person responsible for his care in accord with section 354.[17] That section states that if such order of discharge is entered, “ the court may place the person to whose custody the child is discharged under supervision of the probation service or may enter an order of protection under section three hundred fifty-six or both.” This is not a mandatory requirement and no supervision by the probation service and no order of protection was entered at the time of discharge.
The request for a guarantee covering the placement of Jane with the maternal cousins can, therefore, only be considered as a motion for a reconsideration of the order of discharge or as a request that the court on its own motion modify, set aside or vacate the order of discharge.[18]
In the judgment of this court there is no basis for a reconsideration of the order of discharge, or for a modification, setting aside or vacating of the order of discharge. The requirement for the guarantee contravenes the rights and the best interest *243 of the child. This court finds no basis for condoning, approving, or yielding to the demand for a guarantee made by the State of Michigan. The request is denied and the discharge of Jane is affirmed without any conditions and without referral for supervision of the probation service of this court.

. Appendix A (“ Guaranty Covering Placement of Child in Michigan ”) not published with opinion.

. 13 and 14 Charles .II,-ch. 12, § 1 (1662).

. For excellent discussion, see Daniel R. Mandelker, Exclusion and Removal Legislation, 1956 Wis. L. Rev., pp. 57 — 77.

. Ibid., p. 59, n. 6.

. Ibid., p. 62 and n. 19.

. Ibid., p. 76.

. Uniform Laws Ann., vol. 9C, p. 216.

. Ibid., pp.218-219.

. Ibid., pp.216-217. Ten States have enacted such laws: Maine, 1933, ch. 188; Connecticut, 1933, eh. 117; Colorado, 1937, ch. 262; Delaware, 1937, eh. 96; North Dakota, 1939, ch. 196; South Dakota, 1939, eh. 201; Louisiana, 1940, No. 68; Virginia, 1940, eh. 114; Pennsylvania, 1941, p. 20; California. 1951, p. 376.

.. Mieh. Public Act No. 95 of 1957, § 14, subd. (d).

. See § 374-a.

. Art. I.

. See arts. Ill, IV, V.

. Art. III.

. See Arkansas Public Welfare Act, Activities of the State Department of Social Welfare (Ark. Stat. Ann., § 83-109). The State Department is charged with the regulation of the importation of children.
Iowa Code Ann., tit. 11, § 252.18, subds. 1, 2, 3, authorized removal of any person coming from another State or from another county within the State who has not acquired settlement who is a county charge or is likely to become such. Subd. 3 (added by Acts of 1941 [49 Gr. A.], eh. 148, § 4) declares that if such a person ordered to remove by a court after hearing and fails to do so he shall be deemed and declared to be in contempt of court and may be punished accordingly.
Mich. Stat. Ann. (1960 Rev. vol. 12), § 16.154 entitled poor persons, bringing into county; penalty, provides that any person who brings, sends or procures the bringing or sending of an indigent person to a county with the intent to make such county chargeable with the support of such person shall be deemed guilty of a misdemeanor. This section re-enacts § 13 of the Public Acts of 1869, No. 148. Repealed by the Public Acts of 1961, No. 184, § 50. It was re-enacted without substantive change. See § 16.450 (1).

. For comments which take this view of the privileges and immunities clause, see Mendelker, Exclusion and Removal Legislation, 1956 Wis. L. Rev. 57; Note, Depression Migrants and the States, 53 Harv. L. Rev. 1031 (1940); Note, Interstate Migration and Personal Liberty, 40 Col. L. Rev. 1032 (1940).

. Family Court Act, § 352; L. 1962, ch. 686.

. Family Ct. Act, § 361.