Justine Wise Polieb, J.
This ease presents a series of problems that confront the Juvenile Term of court affecting the constitutional rights of children, the time-lag between the interpretation of their rights by the courts and their implementation, and the continuing denial of equal protection under the Constitution where children are indigent or under the control of public welfare districts in this State. The problems are compounded by the failure of the Legislature to purge from its statutes those sections of the Social Services Law that have been held unconstitutional. They are further compounded by the failure of the public welfare districts to see that the constitutional rights of children, as determined by the courts shall be fully implemented. Finally, they are compounded by the action of public welfare districts that fail to comply with dispositional orders of the Family Court based on the best interests of the child as required by the Social Services Law of New York State.
In the instant case the three children of a mother, who had been recently widowed, were found to be neglected by this court in 1966. They were placed in a voluntary agency at public *384 expense, with the consent of the mother. The mother subsequently moved to California where she had relatives. She rehabilitated herself, secured employment and established a home so that she could reunite the family. In the summer of 1969 the oldest child was released by the voluntary agency to the maternal grandmother in New York who, in turn, sent the child to live with the mother. The mother requested that the two younger children be returned to her before Christmas in 1969. However, despite excellent reports from the Catholic Welfare Bureau in 'California, where the mother received casework guidance, its recommendation that the two younger children be returned to the mother, and the concurrence of the agency having custody, the agency was advised that the children could not be returned pending 1 ‘ fiscal clearing ’ ’ with ¡California. The two younger children had, therefore, been retained in an institution in New York at public expense, despite their mother’s and their own pleas to be reunited, when the case came before this court to extend such placement once more.
This case, therefore, squarely raises the question of why children in the custody of voluntary or public agencies under the supervision of public welfare districts continue to be denied their constitutional right to freedom of travel.
In 1965 this court was confronted with the need of care for five children whose mother had died and whose father was in prison. A paternal aunt, ready to provide care for some of the children, had been advised by probation that the children could be released to her only if the court approved and if clearance was obtained from'the State of Georgia where the aunt resided. At that time probation further advised the paternal aunt that the court could not permit the children to go out of the State if public assistance would be needed, as the State in which the paternal aunt resided would neither grant assistance nor agree to their coming. The aunt, a poor person, who would have required assistance for the children, returned to Georgia and four small children were institutionalized in New York.
The Judge of this court agreed to parole the infant to a maternal aunt who lived in Michigan. Subsequently, although no public assistance was sought for the infant, the State of Michigan, Department of Social Welfare, advised this court that while the home of the maternal aunt could be approved, the State required an interstate agreement by New York “ retaining legal liability ’ ’. This court found that it did not have the power to comply with that requirement and that the demand for such an undertaking as a condition to permitting the infant to remain in Michigan with maternal relatives deprived the infant *385 of her constitutional right of freedom to travel. (Matter of Higgins, 46 Misc 2d 233 [1965].)
In the Higgins case this court traced the origin of the conditions sought to be imposed by the State of Michigan to the 11 settlement ” laws of the English Statute of 1662 and the subsequent Poor . Law statutes enacted by various States. These statutes, in some States, authorized forced removal of a person likely to become a public charge and in others made residence in the States for various prescribed periods a condition to receiving public assistance. The decision in the Higgins case to deny the demand of Michigan and discharge the infant to the maternal relatives was based on Edwards v. California (314 U. S. 160 [1941]).
At the time the Higgins case was decided, this court noted that the State of New York had enacted a statute in 1960 restricting the placement of children outside the State, requiring approval of the receiving State, and authorizing penalties for “ illegal placement ".[1] “As a matter of practice, * * * the Department of Welfare will not authorize a child going to another State or provide transportation without the consent of the receiving State. The delays resulting force the court to place and retain children in emergency shelters and institutions for months * * * Transportation will not be furnished except with the consent of the receiving States. Interminable delays are tolerated, without regard to the welfare of the child. Thus indigence or poverty constitutes the basis for restricting the freedom of a child who is homeless and the property status is used to limit his rights as a citizen”. (Matter of Higgins, supra, pp. 240-241.)
Since the decision in Higgins, the Federal courts have ruled definitively that indirect as well as direct attempts by State agencies to interfere or discourage freedom to travel by imposing residence laws as a condition to securing public assistance are unconstitutional.
In Thompson v. Shapiro (270 F. Supp. 331 [1967]) at page 336, the District Court held that a denial of aid to dependent children (A. D. C.) to a mother on the ground of residence for less than a year, as required by Connecticut law, “ has a chilling effect on the right to travel ”. In Harrell v. Tobriner (279 F. Supp. 22 [1967]) the District Court held that denial of A. D. C. and the denial of benefits under the program for Aid to the Permanently and Totally Disabled, on the ground of the failure *386 to meet the District of 'Columbia one-year residential requirement was unconstitutional in that it constituted a denial of the right to equal protection of the laws as secured by the Fifth Amendment. In Smith v. Reynolds (277 F. Supp. 65 [1967]) the District Court held that denial of A. D. C. to two mothers, on the ground that they had not met the Pennsylvania one-year residence requirement, constituted a classification “without rational basis and without legitimate purpose or function ” (p. 67). The District Court held that if the purpose of the statute was to erect a barrier against the movement of indigent persons into the State or to effect their prompt departure after they have gotten there, the statute would be patently improper and its implementation plainly impermissible (pp. 67-68).
On appeal from these three decisions, the United States Supreme Court reviewed the cases and affirmed the decisions of the District Courts, holding that residence laws imposed by the States as a condition to receiving public assistance were unconstitutional. (Shapiro v. Thompson; Washington v. Legrant; Reynolds v. Smith, 394 U. S. 618 [1969].) The opinion of the court, written by Mr. Justice Bbennan, stated that: “ On reargument, appellees’ central contention is that the statutory prohibition of benefits to residents of less than a year creates a classification which constitutes an invidious discrimination denying them equal protection of the laws. We agree ” (p. 627). In a footnote (n. 6) the opinion further states: “ This constitutional challenge cannot be answered by the argument that public assistance benefits are a ‘ privilege ’ and not a ‘ right ’. See Sherbert v. Verner, 374 U. S. 398, 404 (1963).”
After noting that a one-year waiting period was doubtless well-suited to discourage the influx of poor families, the Supreme Court opinion stated: “ But the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible ”. (Shapiro v. Thompson, supra, p. 629.) The court (p. 630) quoted Chief Justice Taney in Passenger Cases (7 How. [48 U. S.] 283, 492 [1849]): “ ‘ We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States.’ ”
The Supreme Court in its opinion went beyond legislation directed to inhibit migration and (p. 631) reiterated the position taken in United States v. Jackson (390 U. S. 570, 581 [1968]): “If the provision had no other purpose * * * than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional. ’ ’
*387 Following the United States Supreme Court decision in Shapiro v. Thompson (supra), section 139-a of the New York Social Services Law which barred assistance to those whose sole purpose in entering the State was to obtain public assistance, was held unconstitutional. (Gaddis v. Wyman, 304 F. Supp. 717 [1969].)
In the light of the decisions, supra, holding that laws requiring periods of residence as conditions to receiving public assistance are unconstitutional and that State action under such legislation which seeks to chill the constitutional right of freedom to travel is impermissible, there was no justification for denying the reunification of the children in the instant case with their mother. The requirement for 1 ‘ fiscal clearing ’ ’ with California violated the right to travel of the two children involved.
Indeed, under the court decisions read together with certain sections of the Social Services Law of New York, it would seem that the public welfare district had both the power and the duty to provide funds for transportation for the children to join their mother when the agency having custody found it to be in their best interest.
The Social Services Law of New York provides that: “ each public welfare district shall be responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself.”[2]
It further provides that: “ A city public welfare district shall be responsible in its territory for the administration of public assistance and care and the expense incident thereto ” (italics supplied).[3]
Interpretation of these sections to spell out the duty of a public welfare district to provide transportation where it is in the best interest of a child under sections 62 and 76 is not needed where the child has, as in the instant case, been a public charge. The Social Services Law specifically provides that:
“When any person who is cared for at the expense of the state or of any public welfare district has settlement or residence or otherwise belongs to or has legally responsible relatives able or friends willing to undertake the obligations to support him or to aid in supporting him in any other state or country, the department may furnish him with transportation to such *388 state or country, provided, in its judgment the interest of the state and the welfare of such person will be thereby promoted.
“ The expense of such removal shall be paid from the state treasury on the audit and warrant of the comptroller pursuant to a verified account submitted by the department. ’ ’[4]
In the instant case the power and the duty of the public welfare district, to provide transportation for the children who had been “ cared for at the expense ” of the public welfare district since 1966, so that they could be reunited with their mother in California, did not become an issue. When the evidence satisfied this court that extension of placement should not be granted on the ground that it was in the best interest of the children to return to their mother, the maternal grandmother volunteered to secure air transportation to avoid further delay.
However, in spite of its obligation under section 121 of the Social Services Law and the finding of this court, a representative of the public welfare district (Bureau of Child Welfare) on the day following the hearing in this court advised the agency having custody of the children, that the agency could not release the children to join their mother in California. Such action was clearly in violation of the Social Services Law which provides that:
‘1 Nothing in this chapter shall be deemed to take away the jurisdiction or any power or duty of the family court ’ ’.[5]
“ A public welfare district shall be responsible for the welfare of children who are in need of public assistance and care, support and protection * * * insofar as not inconsistent with the jurisdiction of a family court.”[6]
‘1 It shall be the duty of every public welfare official to render assistance and cooperate within his jurisdictional powers with every other public welfare official and with the family court ”.[7]
Despite these provisions, it became necessary for this court to contact the counsel for the Department of Social Services (public welfare district for New York City) and secure his personal intervention in order to achieve the release of the children so that they might travel to join their mother in California on the tickets provided by their grandmother.[8]
On reviewing this case, it becomes evident that the roadblocks that prevented the return of the children to their mother in *389 December, 1969, and kept them in institutional placement at public expense in violation of their best interests, were due to a combination of factors that require correction if other children are not to be hurt in this fashion and denied their constitutional rights.
The Social Services Law is replete with provisions derived from the ancient and archaic Poor Laws that were intended to deprive indigent persons of the freedom to travel. Among these provisions are sections making it a misdemeanor to send or bring any needy person into a public welfare district for the purpose of making him a public charge and requiring security from the person responsible to “convey the needy person out of the state within the time fixed by the court or * * * indemnify the public welfare district”.[9] The section denying public assistance to any person who came into the State solely to secure public assistance which was held unconstitutional in Gaddis v. Wyman (supra), is still part of the Social Services Law.[10] The section providing that any person who brings or causes a child to be brought into the State who does not have State residence shall have responsibility for the child during the child’s minority and thereafter until he is self-supporting remains on the books despite all court decisions on the constitutional right of freedom to travel.[11] A later subsection requires a blanket indemnity bond in favor of the State 1 ‘ in the penal sum of not less than one thousand dollars ’ ’ before a person or organization may bring or cause a child to be “ brought * * *. into this state” and also requires that such person or organization ‘ ‘ will remove from the state within thirty days after written notice is given any such child becoming a public charge during his minority.”[12]
It becomes evident that the Social Services Law of the State which is invoked by public welfare districts needs to be re-examined and amended if the denial of constitutional rights, as determined by the courts, is not to be perpetuated where persons are not aware of their rights or able to protect themselves against the denial of such rights. It becomes equally evident that pending such corrective legislation the New York State Department of Social Services, which has supervisory powers over all public welfare districts, should inform such districts as to their responsibility to protect and assure the constitutional rights of all persons under their jurisdiction. Without such *390 corrective measures old statutes that violate constitutional rights such as the freedom to travel, old hahits or procedures of public welfare districts, the apparent ignorance in both public and voluntary agencies concerning the rights of children and the poor, will continue to bar access to the meaningful enjoyment of constitutional rights.

. Social Services Law, § 374-a. This section enacting the Interstate Compact on the Placement of Children still remains in the New York Social Services Law (formerly Social Welfare Law).

. § 62, subd. 1. The City of New York is constituted a city public welfare district. See § 61, subd. 1.

. § 76.

. § 121, subds. 1 and 2.

. § 58.

. § 395.

. § 135.

. The children were released and after receiving a favorable report on their mother’s home and their adjustment have now been discharged to their mother by this court.

. §§ 148 and 149.

. § 374-a.

. § 382, subd. 1.

. § 382, subd. 4, pars, (a), (b).