ESTATE OF DANIELS: DANIELS, Appellant, v. DRAVES,
Individually and as Executor, Respondent.

*No. 220. Argued January 3, 1972.—Decided February 1, 1972.*
(Also reported in 193 N. W. 2d 847.)

612

For the appellant there was a brief by *Konnak, Constantine & Krohn* of Racine, and oral argument by *Charles M. Constantine.*

For the respondent there was a brief by *Stewart, Peyton & Crawford* of Racine, and oral argument by *John Peyton.*

HALLOWS, C. J.  At the time the will was made and at the time of the probate of the will, under Wisconsin law a husband had no right to elect against his wife's will. However, under sec. 861.05, Stats., created by ch. 339, sec. 26, Laws of 1969, which became effective April 1, 1971, a husband is now given the right of an election. However, the right of election by the husband existed under the Ohio law in force at the time of the death.

At the time of Mrs. Daniels' death, a county court in Wisconsin had probate jurisdiction of the wills "of all persons deceased who were at the time of their decease inhabitants of or residents in the same county . . . ." [1] The Wisconsin cases in the past have considered the term "residence" as used in this statute interchangeable with "domicile." *Will of Baldwin* (1951), 260 Wis. 195, 50 N. W. 2d 463, 51 N. W. 2d 361; *Estate of Morey* (1956), 272 Wis. 79, 74 N. W. 2d 823; *Will of Eaton* (1925), 186 Wis. 124, 202 N. W. 309; *Estate of Read* (1928), 195 Wis. 128, 217 N. W. 709. [2]

---

[1] Sec. 253.10, Stats., was amended by ch. 339, Laws of 1969, effective April 1, 1971, to grant jurisdiction to the county court to probate wills of decedents who were domiciled in the county. By ch. 411, Laws of 1969, reconciling various sections, this section was reaffirmed so that now sec. 253.10 (1) provides that the jurisdiction of the court in probate depends on domicile of the decedent.

[2] In *Will of Baldwin, Estate of Morey,* and *Estate of Read,* this language in sec. 253.10 (1) appeared in sec. 253.03 (1), Stats. In

The parties stipulated in the trial court that Alice E. Daniels upon her marriage to Charles W. Daniels took his domicile and this appears to be the general rule. 25 Am. Jur. 2d, *Domicil,* p. 37, sec. 48; Restatement, *Conflicts of Laws,* Domicil, p. 50, sec. 27. In the *Will of Baldwin, supra,* we indicated this rule that a married woman takes the domicile of her husband was applicable to determining a wife's residence or a domicile under sec. 253.10 (1), Stats. However, Wisconsin has deviated from this rule in divorce cases and has held that a wife might have a separate residence or domicile for venue or jurisdictional purposes in a divorce action if her husband's cruelty drove her away. This court has never decided whether a wife on friendly terms with her husband might acquire a separate residence, if he consented. The instant facts do not show that Alice E. Daniels or Charles W. Daniels ever considered the question of a separate domicile for each of them. The parties did not live apart so we do not have the question of whether a wife living apart from her husband by mutual consent may acquire a separate domicile. *See Younger v. Gianotti* (1940), 176 Tenn. 139, 138 S. W. 2d 448; *Matter of Daggett* (1931), 255 N. Y. 243, 174 N. E. 641. We, therefore, accept the stipulation and consider, what was the domicile of Charles W. Daniels at the time of Alice E. Daniels' death?

A domicile may be classified as a domicile by birth, a domicile by choice, or a domicile by operation of law. *See* Black's Law Dictionary (4th ed.), p. 572, "Domicile." We deal here with domicile by operation of law, which was acquired by marriage, and also with domicile of choice. It might be said that "domicile" includes residence but "residence" does not necessarily include domicile.

---

*Will of Eaton,* this language was in sec. 2443. See 57 Am. Jur., *Wills,* p. 524, sec. 766, where it is said, " 'Residence' is ordinarily deemed synonymous with 'domicil' for the purpose of determining the question of jurisdiction of proceedings to probate a will."

Domicile is generally regarded as the place where a man has his fixed and permanent home or residence to which he intends to return whenever he is absent therefrom. It is not a residence for any special or temporary purpose but one intended to be permanent for an unlimited or indefinite period.[3]

Since one's residence or domicile for probate purposes is jurisdictional, the proponent of a will has the burden of persuasion on the issue. Any person seeking the affirmative action of a court has the burden of proving or demonstrating its jurisdiction to grant the relief sought. 21 C. J. S., *Courts*, p. 172, sec. 112.[4] There is no question that Charles W. Daniels' domicile was in Ohio at the time of the marriage. Once a domicile has been established, it is presumed to continue until a new domicile is created; *Baker v. Department of Taxation* (1945), 246 Wis. 611, 18 N. W. 2d 331; *Will of Heymann* (1926), 190 Wis. 97, 208 N. W. 913, and that the burden is on one alleging such change to prove it; *see* 25 Am. Jur. 2d, *Domicil*, pp. 62, 63, secs. 86, 87.

Thus the issue to be decided on this appeal is whether the trial court's finding that Alice E. Daniels' domicile at the time of her death was Racine is against the great weight and clear preponderance of the evidence; if it is not, we must affirm. A review of the evidence convinces us that the facts and the inferences reasonably to be drawn therefrom create such a conflict that there is no great weight or clear preponderance of the evidence on the issue and this is one of those cases where no

[3] *In re Garneau* (7th Cir. 1904), 127 Fed. 677, 62 C. C. A. 403; *Kurilla v. Roth* (1944), 132 N. J. L. 213, 38 Atl. 2d 862; *Hartzler v. Radeka* (1933), 265 Mich. 451, 251 N. W. 554.

[4] On a somewhat analogous problem involving sec. 269.46, Stats., on the relief from judgments or orders within one year of notice of the entry thereof, *see Harris v. Golliner* (1940), 235 Wis. 572, 294 N. W. 9, and *Tuszkiewicz v. Lepins* (1968), 41 Wis. 2d 102, 106, 107, 163 N. W. 2d 188, which explained *Harris*.

matter which view the trial court took of the facts, it would have to be affirmed, although if this court were the trier of the facts, it would not have come to the same conclusion.

After the marriage on May 9, 1968, in Kentucky, the parties spent about two thirds of their married life in Racine and one third in Ohio. At the time of the marriage, Mrs. Daniels maintained an apartment on Carlisle Avenue in the city of Racine; Mr. Daniels owned a home in Shad Hollow, a short distance from Wakefield, Ohio. From May 10th to June 15th, the parties spent in Racine and then returned to Ohio for six days. On June 22d they returned to Racine for thirty-one days and then went back to Ohio on July 23d for seventeen days. On August 9th they again came to Racine where they stayed forty-two days, returning to Ohio on September 21st. They then stayed in Ohio for thirty-one days but on October 22d came back to Racine, where they remained for forty-six days. On December 7th they returned to Ohio so Mr. Daniels could be medically examined and continue to receive disability checks. While there, he became ill and was hospitalized for approximately a week. On January 8th they returned to Racine and four days later Mrs. Daniels died.

The executor Draves testified Charles said he liked Racine because there was so much to do there and a few days after Mrs. Daniels' death, Mr. Daniels made a statement while at the bank in connection with a joint checking account that he was a resident of Racine and intended to stay. In an insurance application on October 24, 1968, Charles gave his present residence as Racine and stated he had lived there since the date of their marriage and his former residence was Wakefield, Ohio. There was testimony Mr. Daniels expressed an interest in investing in real estate in Racine after he sold his house in Ohio. After Mrs. Daniels died Mr. Daniels repeated his inten-

tion to stay and invest in Racine. There was testimony by three witnesses that Mrs. Daniels made strong declarations of her dislike for Ohio and living there.

There was other testimony of statements made by Mr. Daniels to the effect he intended to buy a home on Washington Avenue in Racine across from Mrs. Daniels' sister, and that he and Mrs. Daniels could live upstairs and the sister could live downstairs. The sister testified Mr. Daniels told her as late as December "to stay put" in her Washington Avenue home because when he got back from Ohio he was going to buy the house across the street. There was testimony Mrs. Daniels had said she and Mr. Daniels should buy the house and they could live upstairs and her sister could live downstairs, and that Mr. Daniels stated this would be a good idea. There was other testimony that Charles had stated at a funeral home that he and Mrs. Daniels intended to sell the Ohio house and buy the one on Washington Avenue. There was testimony Mr. Daniels sought employment in Racine and stated as late as November, 1968, he intended to get a part-time job as a used-car salesman or in a doughnut shop.

The trial court found most of the activities of the Daniels during the marriage were determined in a great measure by Mrs. Daniels; and the witnesses, including friends of Mr. Daniels in Ohio, acknowledged this fact. Such testimony is relevant on the issue of Mr. Daniels' intentions. It is not unknown that a husband considers the wishes of his wife in matters of mutual concern and on occasions her ideas may be controlling.

Although in the *Estate of Ford* (1961), 14 Wis. 2d 324, 328, 111 N. W. 2d 77, we stated documentary evidence was entitled to greater weight than oral testimony in determining domicile, here the documentary evidence is also in conflict. In support of the trial court's findings are Mrs. Daniels' death certificate in which Mr. Daniels'

address is listed as Racine, his insurance application stating his residence as Racine, and his will dated August 22, 1968, stating his residence as Racine county.

The trial court stressed the fact the parties kept an apartment in Racine on Carlisle Avenue until November when they took another apartment on Layard Avenue, which they hardly would have done if they intended to remain residents of Ohio. Mr. Daniels testified when he came to Racine in October he drove his car to Racine so he could bring antiques which Mrs. Daniels had purchased. He advertised to rent a garage in Racine. He stated he intended to transfer his Masonic membership to the Racine lodge and to become a member of the church to which Mrs. Daniels belonged. The only bank account maintained by Mr. and Mrs. Daniels was at the American Bank & Trust Company of Racine. Mrs. Daniels' will, executed as late as December 5, 1968, said she was a resident of Racine.

While it may be true that for some months after their marriage the Daniels were undecided whether they were going to live in Ohio or Racine, the test is, what was the domicile of Mr. Daniels on the date of death of Mrs. Daniels, January 12, 1969? The evidence accepted by the trial court well sustains the finding that Mr. Daniels at that time intended Racine to be his permanent domicile. The evidence to the contrary is the testimony of Mr. Daniels himself that he never intended to make Racine his permanent home or to consider it such, that he had an Ohio driver's license and his car had Ohio plates, and that he voted by absentee ballot in Ohio in 1968. There is also testimony of friends that as late as November they heard Alice say she was going to move to Ohio and there was friction between her and her sisters. There is also testimony that Charles said during the summer of 1968 that he and Alice wanted to go back to Ohio, that Mrs. Daniels wanted to buy some land and that she wanted to sell Mr. Daniels' home and build a new one

closer to the highway. There is testimony Charles did not like Wisconsin's weather; its dampness was bad for his sinuses. On the marriage license, they both gave their residence as Ohio. There is other evidence from which inferences could be drawn that Mr. and Mrs. Daniels intended to make their permanent residence in Ohio.

It is argued that once a person establishes his domicile, he cannot change it unless he physically abandons the old domicile and establishes a new one, *Estate of Ford, supra,* and a mere temporary absence does not render a domicile abandoned if the person has an intention to return permanently. *Eau Claire County v. Milwaukee County* (1964), 24 Wis. 2d 292, 128 N. W. 2d 666. The *Estate of Ford,* page 327, quoted from the *Will of Eaton* (1925), 186 Wis. 124, 202 N. W. 303, the rule that a domicile once established is not lost until a new one is acquired, and quoted from the *Estate of Morey* (1956), 272 Wis. 79, 74 N. W. 2d 823, the rule that to create a new domicile there must be the physical abandonment of the old domicile and the removal to and an intention to establish a new one.

These rules were formulated when people generally had only one residence, but in applying the rule to a situation where a widow and a widower marry and each has a home, the physical abandonment of the old domicile requirement does not require the house must be sold or a physical moving therefrom. Where two homes are owned, domicile is determined by intention and physical acts are considered to express which residence is to be considered the permanent home as the domicile.

*By the Court.*—Order affirmed.